Daniel G. Albert, J.
Petitioners Murphy and Licardi in this
article 78 proceeding are designated “ employable ” recipients of public assistance in Nassau County and are trainees in public supported training programs. They seek to enjoin the respondents, Commissioner Wyman, Commissioner Shuart, and their respective State and County Social Services Departments from implementing a change in the manner of payment of shelter assistance which in effect would cause petitioners to receive during the first two weeks of each month, not the entire shelter check for the month, which they have to date been receiving on the first day of the month, but rather one half thereof, with the balance to be paid during the latter two weeks of such month. The petitioner-intervenor Bussey is a designated 1 ‘ employable recipient ” of public assistance in this county but is not a trainee as are Murphy and Licardi. Bussey seeks to intervene pursuant to CPLR 7802 (subd. [d]) in order to add his status to the class of persons affected by the aforesaid policy change and in order to raise additional arguments in support of the petition herein. In the court’s discretion and in the interests of justice, the application to intervene is granted, there being no opposition thereto. (See Matter of Muccioli v. Board of Stds. S Appeals, 42 Mise 2d 1088 [Sup. Ct., 1964].)
Petitioners seek to have this action treated as a class action, such class being comprised of all employable recipients of public assistance in Nassau County, as that category is defined in Chapter 298 of the Laws of 1971, pursuant to CPLR 1005, which provides: ** Where the question is one of a common or general interest of many persons or where the persons who might be made parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.”
It appears to this court that the issue presented herein is “ one of a common or general interest of many persons.” The members of the class are easily identifiable, being the class specifically described by administrative ruling as employables and trainees under chapter 298 of the Laws of 1971. It cannot be disputed that the approximately 2,100 families affected are too numerous to join individually. In fact, it would be unjust to require, as respondent Wyman suggests, that each affected
*896 family litigate in a separate lawsuit the validity of the uniform split-rent policy. As the court held in Harris v. Wyman (60 Misc 2d 1076, 1077 [Sup. Ct., 1969]), upholding a class action of welfare recipients in Nassau County challenging a State-wide residency requirement, “clearly, the purpose of CPLR 1005 (subd. [a]) was to avoid a multiplicity of suits.”
On November 1, 1971 this court issued a preliminary stay in this proceeding in order to protect the status quo for the entire class of employable recipients. “Because of serious questions raised as to the validity and constitutionality of such a (split-rent) procedure and its acceptability by the respective landlords,” temporary class-wide relief was ordered. If the class-wide policy is invalid, then surely class-wide protection from that policy is warranted.
The present case presents even more compelling circumstances for class relief than those in Young v. Shuart (67 Misc 2d 689 [Sup. Ct., 1971]), where this court upheld a class action on behalf of welfare recipients. In Young, the local agency as a matter of policy refused emergency assistance to all victims of theft or loss of cash without consideration of the facts, pursuant to a State-wide administrative directive. Petitioners there attacked this inflexible policy as a (pp. 691-:692) “breach of duty which adversely affects in the same way the interest of every grant recipient,” and “‘being a wrong done to all, it should be susceptible of correction by legal action taken for the benefit of all ’, Lichtyger v. Franchard Corp. (18 N Y 2d 528, 537). ’ ’ Further, the court ruled that a judgment therein, as here, ‘ ‘ could not, of course, prejudice the interests of any members of the class.” (See, also, Grissett v. Shuart, N. Y. L. J., Oct. 22, 1971, p. 20, col. 3.)
Respondent Wyman urges that a “ unity of interest of one kind or another ” is necessary for a class action to be found and that “ separate wrongs to separate persons, though committed by similar means and pursuant to a single plan ” may not constitute a sufficient unity, citing, inter alia, Hall v. Coburn Corp. (26 N Y 2d 396 [1970]). However, there is but one “ wrong ” complained of here: respondent Wyman’s administrative directive which directly affects 2,100 families in Nassau County in an identical manner. If the inflexible directive is invalid as to one person, it is so as to all. Further, as noted in Young v. Shuart (supra, p. 692), “ CPLR 1005 (subd. [á]) is not limited to those situations alone [involving unity of corporate stock ownership] and (that) the question of whether respondent’s flat policy determination is permissible ‘ is one of common or *897 general interest of many persons.’ ” (See, also, Kovarsky v. Brooklyn Union Gas Co., 279 N. Y. 304 [1938].)
An article 78 proceeding is analogous to a motion for summary judgment and can properly be used to provide class relief. Furthermore, it is totally impractical and a delay of justice to relitigate repeatedly the validity of the split-rent directive in separate lawsuits when precisely the same policy would be at issue. Unlike the individual wrongs in Gaynor v. Rockefeller (15 N Y 2d 120 [1965]) and Summers v. Wyman (64 Misc 2d 67 [Sup. Ct., 1970], affd. 36 A D 2d 795 [2d Dept., 1971]), here there is one blanket administrative ruling markedly altering the shelter payments of all employable and trainee recipients of public assistance. The interests of justice and judicial economy will be served by granting class relief so that a complete resolution of the issues raised herein can be attained.
As indicative of the position in which each of the petitioners finds himself, petitioner Murphy in his moving papers indicates that he has been receiving from the Department of Social Services $148 on the 8th and 22d days of each month for food and other expenses, and $150 on the first of each month for the rent on his apartment. On October 25, 1971, he received a letter from the Nassau County Department of Social Services indicating that rent money commencing for the month of November would be given in separate checks twice a month along with the food checks. The letter contained this admonition: “ make sure your landlord knows — tell him right away — that you will pay the rent in two parts beginning next month and from now on.” The petition alleges that as a result of the new procedure, petitioner Murphy will find himself in severe financial difficulties. He is unable to pay his landlord in the manner suggested by the Department of Social Services since the landlord is not required to accept rent in such a manner. If he fails to pay the rent on the first of the month, he may be evicted, and his family will suffer irreparable injury. Furthermore, it is asserted that petitioner’s landlord does not know that petitioner is a recipient of public assistance and if the landlord were to discover that petitioner is a welfare recipient, his tenancy would in all probability be seriously jeopardized. It is further alleged that revealing to petitioner’s landlord that petitioner is a recipient of public assistance would subject him to embarrassment and humiliation.
The aforesaid letter from Commissioner Shuart, which was received by all three petitioners, reads as follows:
*898 1 ‘ IMPORTANT NOTICE
“ As a client who receives public assistance from this Department and who is considered employable, you have been picking up your checks for food, clothing and other basic needs when you report twice-a-month to the New York State Employment Services office. Checks for your rent or mortgage payments have been sent directly to you by mail before the first of the month.
“ But, as the result of a ruling by the New York State Department of Social Services, next month — November — the amount of money for rent will be given to you in separate checks when you visit the State Employment Service.
‘ ‘ This means that each time you report to the Employment Service you will get two checks — one for your basic needs and the other to pay one half of your rent. It also means that money for rent will be available to you in two half-payments, but not necessarily on the first of the month.
“ Make sure your landlord knows — tell him right away — that you will pay the rent in two parts beginning next month and from now on. One payment can be made within the first 15 days of the month and the other 15 days later.
“ Thank you for your cooperation.
(s) James M. Shuart Commissioner ”
As can be seen from Commissioner Shuart’s letter, it is assumed that the landlords will accept rent in two equal semimonthly payments, a method of payment which no lease, mortgage, or statute compels them to accept, and some background on the adoption of this policy and its implementation in Nassau County is necessary for a complete understanding of the situation at bar.
On May 24, 1971, paragraph d of subdivision 4 of section 131 of the Social Services Law was amended by section 5 of chapter 298 of the Laws of 1971, adding the following provisions:
‘ ‘ Every employable recipient of public assistance or person who is deemed not to be employable by reason of full-time satisfactory participation in an approved program of vocational training or rehabilitation shall receive his public assistance grants and allowances in person from the division of employment of the state department of labor, in accordance with regulations of the department.” Pursuant to such amendment, the respondent State Department of Social Services enacted a regulation which requires every employable recipient of public assistance to receive in person two checks, each containing one *899 half the amount due for his rent, on two separate visits to the State Employment Service office each month. Said regulation mandating the payment of public assistance for rent in two separate installments to be received by employable welfare recipients on separate visits monthly went into effect in all of the counties of New York State on July 1, 1971.* The implementation of the new regulation was delayed in Nassau County because of the opposition raised by the Nassau County government and its Department of Social Services.
Nassau County has opposed this policy on the ground that it will lead to mass evictions of welfare recipients within the county who will be unable to pay their entire rent on the first of the month, and Commissioner Shuart in his affidavit stated that “ Nassau County is unique in this regard because of its acute shortage of housing.” Another reason asserted by the Commissioner for the opposition of the Nassau County government to the implementation of this policy within its borders was that the employable welfare recipients would have to disclose to their landlords that they are welfare recipients, thereby establishing another basis for eviction not prohibited by statute.
The government of Nassau County and its Department of Social Services tried to dissuade the State of New York from implementing this policy within the county for the above reasons, but despite these efforts, the county was ordered by the State Department of Social Services to comply with the new regulation beginning on November 1, 1971. This proceeding was thereupon instituted by petitioners by order to show cause on October 29, 1971 to enjoin the State and county from implementing the split-payment policy, but only insofar as it applied to rent payments, not other subsistence payments.
Petitioners first find fault with the manner in which the split-rent policy was adopted, but this court does not agree. It is asserted that the policy change in the manner of payment will effect a change in the amount of payment, thereby necessitating adequate notice to such recipients and an opportunity for a fair hearing. While such requirements do attach to any assistance reduction (see Goldberg v. Kelly, 397 U. S. 254 [1970]; Code of Fed. Reg., tit. 45, § 205.10; 18 NYCRR 84.3; 355.3; Diaz v. Wyman, 68 Misc 2d 286), no such reduction has occurred herein *900 and no such hearing was necessary. Petitioners are to receive exactly the same shelter amount on a monthly basis, although broken up into two equal semimonthly payments. The total amount on a monthly basis is the same under either manner of payment, and thus petitioners’ first argument must be rejected.
The afore-stated purpose behind the policy of identifying those welfare recipients designated “ employable ” is manifestly sound and reasonable. The intent of the Legislature in promoting this policy was to restore to employment as many employable recipients of public assistance as possible. The State Department of Social Services, in implementing this policy as prescribed by chapter 298 of the Laws of 1971 requires that food allotments be picked up personally by the employable recipient every two weeks at the local State Employment Service. Such a requirement satisfies both the letter and the spirit of the legislative enactment, since the recipient must report to the State Employment Service every two weeks to receive his food allotments, and this requirement of identification of such employable welfare recipients is not challenged herein.
What, then, is the purpose of requiring the employable recipient to receive his shelter payment in two semimonthly payments rather than in one monthly payment 1 His identification at semimonthly intervals has already been accomplished as indicated above, and no objection is made to his having to pick up his rent allotment, only the semimonthly payment of same. Is there any reasonable purpose behind splitting the shelter payments ?
Commissioner Wyman in his answer, simply asserts that the policy change under attack in this proceeding “ is a reasonable exercise of discretion by the State respondent in his administration of the Social Services Law,” and in his memorandum of law he states in a conclusory fashion that ‘ ‘ a modification in the manner of payment to better implement the purposes of the Social Services Law § 131 subd. 4 is reasonable,” citing Rojas v. Wyman (N. Y. L. J., July 19, 1971, p. 2, col. 5). In the Rojas case the petitioners in New York County were attacking the statute itself and the policy of identifying employable recipients of welfare payments. No such broad attack is made here, and as indicated above I have concluded that the general legislative policy is reasonable and commendable.
The administrative ruling made by Commissioner Wyman and imposed upon Commissioner Shuart of this county to compel employables to receive their shelter assistance in semimonthly payments constitutes an administrative determination entitled *901 to a presumption of regularity. This court cannot substitute its judgment for that of the respondent State administrative agency and such a discretionary determination will only be set aside by this court if it is shown to be arbitrary or capricious, totally unreasonable and an abuse of the discretion entrusted to the State Commissioner.
In the Rojas case, relied upon heavily by the respondent, Mr. Justice Postel found that'the allegation “ that some recipients will be evicted from their apartments * * # (was) merely conjecture and not based upon facts. ’ ’ Such is not the case herein. Both the petitioners and respondent Shuart have submitted concrete evidence that the imposition of split-rent payments in Nassau County will result in scores of evictions. Commissioner Shuart conducted a survey at respondent Wyman’s request to determine the likely reaction of landlords to the new policy. The survey indicated no tolerance whatever for biweekly payments of rent and a strict adherence to the prevailing monthly payment practice. The resulting evictions in a county with the lowest vacancy rate in New York State mean certain motel placement with the inevitably devastating crush and disruption to families and exorbitant cost to the taxpayers. In point of fact, since the announcement of split shelter payments, ‘ ‘ the list of welfare homeless grows,” according to Commissioner Shuart. These actual occurrences and surveys are far from “ speculative ” as they were in the Rojas case. The following are excerpts from Commissioner Shuart’s letter of August 17, 1971 to the State Department of Social Services:
‘ ‘ With reference to your letter of August 4 on the distribution of checks for the unemployed employables through the New York State Department of Labor, this Department would like to stress the critical need to continue a system of mailing the checks directly to recipients on the first of the month. * * *
“ As I noted to you on June 18, landlords in Nassau County have been accustomed to the receipt of such monies on the first of the month * * *. This County, additionally, has the lowest housing vacancy rate — less than one-and-one-half per cent — in the State of New York.
“ The independence of landlords and the extreme lack of facilities combine to create a stubborn reluctance to accept payments on any other day but the conventional first of the month.
“Public housing authorities — town and village — surveyed by this Department have indicated that an additional cost would be levied on clients for late payments beyond the first day of the month.
*902 “Many Nassau County landlords have placed penalties — called ‘ legal fees ’ or ‘ marshall’s costs ’ — into the leases with tenants in case of late payments, usually any made after the first five days of the month. Landlords with the largest number of holdings hire full-time attorneys for the very purpose of handling such legal actions and evictions.
‘ ‘ Failure to receive rent payments on the first of the month for such landlords would be sufficient reason to take legal actions for evictions.
‘ ‘ Bent collection problems on a staggered payment system will be considered by landlords as harrassment and1 adding costs for bookkeeping to their operations * * * This will increase their pressure to remove tenants on public assistance.
1 f By the same token, they can be expected to deny facilities to prospective new welfare tenants, closing off more resources to this Department.
‘ ‘ As a consequence, the Department anticipates an increased usage of emergency housing, such as hotels and motels, with the increased associated costs.
“It is ironical, with this Department’s intensive campaign to remove clients from motels and hotels proving so successful, that this could be seriously reversed by the escalation of client evictions. Since reaching a high of 347 hotel-motel cases in Feb. of this year, the Department has been able to reduce this number to just above 200 to date.”
Respondent Wyman answered this factually documented letter by response of October 1, 1971, directing Nassau County to implement the split-shelter payment policy by November 1,1971. Were it not for the temporary stay issued by this court from the Bench on November 1, 1971, such massive evictions would have already taken place, and the harm to the employable recipients would indeed have been irreparable, the cost to the county’s taxpayers exorbitant.
Respondent Wyman does not deny, and has not introduced a single piece of evidence to controvert petitioners’ assertions and Commissioner Shuart’s projections that such evictions will be caused by splitting the rent payments. His only reply is to label such statements as speculative or merely conjectural, and such an answer is clearly rebutted by the factual evidence gathered by Commissioner Shuart, whose expertise in the matter of public housing and assistance in this county must be recognized and accorded great weight. Mere convenience and uniformity of policy throughout the State are not sufficient reasons to validate an otherwise unreasonable and harmful administrative policy.
*903 Under these circumstances, in light of the probability of massive evictions, the acute shortage of housing, the enormous cost to out already overburdened taxpayers, and strenuous opposition on the part of thei Nassau County Social Services Commissioner, concededly the expert on Nassau County public assistance affairs, this court finds the policy determination of the State respondent, to compel employable public assistance recipients in this county to receive their shelter allotments in two equal semimonthly payments, to be arbitrary and capricious, unreasonable and contrary to public policy. Accordingly, the petition herein is granted and respondents are enjoined from implementing in this county the split-shelter payment policy described in the State respondent’s administrative letter of June 9, 1971 and other letters and documents annexed to the answer of respondent Shuart.
As a final point, petitioners could hardly be expected to “ exhaust their administrative remedies ” when they were notified of the change in the payment of their shelter allotments only six days prior to the effective date of such change. Any attempt to obtain an administrative remedy would of course have been futile and meaningless, since it could only have followed the implementation of the policy under attack and the irreparable harm of eviction and homelessness might already have been a fait accompli. Under such extreme exigent circumstances the petitioners properly sought and received court protection. (See Armstrong v. Manzo, 380 U. S. 545 [1965] ; Matter of Wildstein v. Barbaro, 61 Misc 2d 31 [Sup. Ct., 1969].)
While the particular policy change discussed herein has been invalidated as arbitrary and capricious, this court does not mean to foreclose all possibilities of change as to the administration of public assistance funds in regard to designated employable recipients thereof. The State and County Social Services Commissioners are urged to confer further in their effort to implement the admittedly salutary legislative policy of identifying such employable recipients, keeping in mind the possibility of irreparable harm to the recipient and the financial onus being placed upon the already overburdened Nassau County taxpayer.

 The stated salutary purpose for this State-wide policy change is contained in the first sentence of the administrative letter from the State Department of Social Services to all Commissioners, annexed to respondent Shuart’s Answer as Exhibit A: “As you know, the Laws of 1971 place a renewed and expanded emphasis on restoring all employable recipients of public assistance to employment in the regular economy.”